**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**SOUTHERN DIVISION**

| | | | |
|---|---|---|---|
| TIMOTHY MAZER, | * | | |
| Plaintiff, | * | | |
| v. | * | Civil Action No. AW-03-3650 | |
| SAFEWAY, INC., | * | | |
| Defendant. | * | | |

\* \* \* \* \*

## MEMORANDUM OPINION

Plaintiff Timothy Mazer ("Plaintiff" or "Mazer") has brought this suit against Safeway, Inc. ("Safeway" or "Defendant"), alleging that Safeway failed to pay Mazer compensation and benefits in violation of the Employment Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001-1461 (2005), and Maryland law. Currently pending before the Court is Defendant's Motion for Partial Summary Judgment [37]. The Court has reviewed the entire record, as well as the Pleadings, with respect to the instant motion. No hearing is deemed necessary. *See* Local Rule 105.6 (D. Md. 2004). For the reasons stated below, the Court will GRANT *in part* and DENY *in part* Defendant's Motion for Summary Judgment.

## FACTUAL & PROCEDURAL BACKGROUND

The following facts are taken in the light most favorable to the non-movant. Mazer was an employee at Safeway who has held several management positions. In 1996, Mazer became Safeway's Director of Pricing for the Eastern Division.

### Safeway's Centralization and Layoffs

Sometime around late 2001 or early 2002, Safeway initiated a plan to centralize jobs, duties, and responsibilities to its corporate headquarters in California. To announce certain layoffs, Roger

Herding ("Herding"), the Vice President of Marketing, and Donna Gwin ("Gwin"), the Director of Human Resources for the Eastern Division held a meeting with the employees that would be terminated.  At that meeting, Mazer learned that Safeway planned to eliminate Mazer's job as Pricing Director for the Eastern Division as part of this reorganization.  Herding initially told Mazer that he would be laid off on July 5, 2002.

Herding and Gwin explained to the employees at this meeting what benefits and severance might be available to them.  Although employees had to work through the initial layoff date to be eligible for any severance payments, the employees that left Safeway after that date would be eligible for severance pay as long as they gave Safeway two weeks notice.  Herding and Gwin emphasized to these employees, however, that they would not be eligible for severance pay if Safeway terminated their employment for an involuntary reason.  Herding and Gwin also distributed written materials summarizing this policy as well as the answer to questions related to benefits and severance to the discharged employees.

As Mazer's July 5, 2002 layoff date drew near, Herding asked Mazer to continue his employment at Safeway until August 9, 2002.  With the second layoff date approaching, Herding requested once again that Mazer continue his employment at Safeway.  Mazer agreed to remain in his position as Safeway's Director of Pricing for the Eastern Division until January 3, 2003.

At some point after Mazer learned that Safeway planned to eliminate his position, he asked Gwin whether he would be eligible for the 2002 bonus.  To receive a bonus, an employee had to hold a "bonus eligible" position[1] on November 1, 2002.  Gwin testified that she told Mazer that "he

---

[1]It is not clear what positions were considered "bonus eligible."  Regardless, parties seem to agree that Mazer's position as Pricing Director for the Eastern Division was a "bonus eligible" position.

would have to give two weeks' [*sic*] notice. And that if he [gave]... notice that he would be entitled

to his bonus, any bonus that was earned . . . . [I]f there was any bonus earn, that he would be entitled

to it." Gwin Depo. at 38.

### Mazer's Termination

Realizing that his employment at Safeway would soon come to an end, Mazer began

searching for other employment. Mazer applied for a pricing supervisor position at Safeway's

competitor, Giant Food, Inc. ("Giant"). Mazer interviewed with Giant in November 2002, and in

December 2002, Giant offered Mazer the position of Pricing Supervisor. Mazer accepted the

position at Giant and prepared to leave his employer, Safeway. Mazer submitted a letter of

resignation to Safeway on December 19, 2002, giving two weeks notice. Mazer's supervisors,

however, decided that he should not work the two weeks from December 19, 2002 to January 2,

2002. At Safeway's requested, Mazer gathered his personal items and left the Safeway building

with an escort on the afternoon of December 19, 2002.

The day after Mazer tendered his resignation, Safeway began an investigation of Mazer's

use of pricing information. Safeway's computer system had filters in place that would identify files

sent over the network that could contain potential pornographic or offensive material. Apparently,

one of these filters stopped email sent by Mazer, which contained confidential pricing information.

Mazer acknowledges that he attempted to email pricing information to his home computer on

December 18, 2002. Mazer admits that he copied and attempted to send a list of approximately

1,100 items sold by Safeway. This list also included information related to each item's cost, retail

price, gross profit and sensitivity code. Because of the size of this file, Mazer had difficulty sending

this data by email. Eventually, he copied the information onto a disk. Copying or sending email

with company files to a home computer, Mazer contends, was common practice among Safeway management.  Mazer also states that he needed this information to perform his normal duties, which included identifying, investigating and correcting erroneous entries on this price listing database.

On Monday, December 23, 2002, Mazer met with Safeway's Eastern Division Security Director, Tom Harris, as well as Herding and Gwin.  At this meeting, Harris questioned Mazer about his computer activities.  In particular, Harris and Mazer discussed his treatment of the company's confidential pricing information.  Harris asked Mazer if he could go to Mazer's house to retrieve any confidential pricing information there.  Mazer agreed.  When they reached the home, Mazer gave Harris diskettes and Mazer's planner.  Harris asked to enter the house to search Mazer's personal computer, but Mazer responded that he had relatives in town and requested that Harris come back at another more convenient time.

Several days after this incident, Harris once again contacted Mazer.  Harris inquired whether Mazer had any additional confidential Safeway information.  In response, Mazer stated that he had collected other items and would return these items to Safeway.  That day, December 27, 2002, Mazer met Harris in the Eastern Division parking lot and returned additional, tapes, disks, and a CD-ROM containing Safeway's business strategy in a competitive market.  At the parking lot meeting, Harris gave Mazer two letters.  The first letter stated that Safeway had terminated Mazer's employment, effective December 23, 2002, for cause.  The second letter alleged that Mazer misappropriated confidential company information.  Specifically, this letter stated:

> Based on investigation . . . we believe that, prior to the termination of your employment with Safeway, you accessed and downloaded . . . Safeway's pricing database and related or derived pricing reports, including price sensitivity indicators, and other Confidential Information.
>
> . . .

4

> Your actions in misappropriating confidential information are unlawful and actionable, and directly violate the Maryland Uniform Trade Secrets Act and your Duty of Loyalty to the Company . . .[T]o protect Safeway's Confidential Information, despite your unlawful actions, you must agree to permit an IT professional of Safeway's choice to access your home computer(s) and personal email account(s) to verify that all Confidential Information is permanently removed and that no Confidential Information has been transferred to any other location.

Safeway sent a carbon copy of the letter to the Executive Vice President of Giant, Mazer's future employer.

On December 27, 2002, the day Mazer received this letter, Mazer attempted to exercise stock options that Safeway had granted him during the course of his employment. Safeway had Mazer's stock options on hold, so Mazer was unable to sell these shares. Ultimately, Safeway refused to allow Mazer to exercise any previously granted stock options.

Shortly after Giant received this correspondence from Safeway, Giant officials met with Mazer to discuss the allegations in the letter. Mazer's supervisors at Giant, as well as internal and external counsel to Giant, attended this meeting. Mazer recalls that during the meeting, Giant's counsel discussed what types of knowledge Mazer "was able to use . . . and what types of knowledge [he] was not allowed to use" as an employee of Giant.

On November 10, 2003, Mazer instituted this action against Safeway in the Circuit Court of Maryland for Prince George's County. On December 24, 2003, Safeway filed a Notice of Removal, pursuant to 28 U.S.C. §§ 1441 and 1446. Mazer's Amended Complaint contains seven counts. Count I is a state statutory claim for his base salary, sick pay, severance pay, stock options and bonus eligibility. Count II and III are ERISA claims. Count IV is a claim for breach of the Stock Option Agreement between Plaintiff and Safeway. Count V is also a breach of contract claim and

alleges that Safeway breached an employment contract between Plaintiff and Safeway.  Finally,

Count VI and VII relate to the Safeway's communications with Giant.  Count VI is a claim for

defamation, and Count VII is an invasion of privacy claim.

Safeway moved for partial summary judgment on May 24, 2005 on Count I on the base

salary, stock option, bonus pay, and severance pay claims.  Safeway also moved for summary

Judgment on all remaining counts.  This motion is ripe and ready for disposition.  The Court now

will rule on this motion.

## STANDARD OF REVIEW

Summary judgment is only appropriate if there are no genuine issues of material fact and the

moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *see Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 323-25 (1986).  In a motion for summary judgment, the moving party

discharges its burden by showing an absence of evidence to support the non-moving party's case.

*Celotex*, 477 U.S. at 325.  To defeat a motion for summary judgment, the non-moving party must

come forward and show that a genuine issue of material fact exists.  *See Matsushita Elec. Co. v.*

*Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  A court will grant summary judgment "[w]here the

record taken as a whole could not lead a rational trier of fact to find for the non-moving party."  *Id.*

## DISCUSSION

Plaintiff makes claims under both ERISA and the Maryland Wage Payment and Collection

Law (the "Wage Payment Act"), Md. Code Ann., Lab. and Empl. §§ 3-501 to 3-509 (West 2005).

Although Plaintiff's state and federal claims appear interrelated, ERISA preempts any state law

cause of action that relates to an ERISA employee benefit plan.  *See* 29 U.S.C. § 1144(a) (ERISA's

provisions "shall supersede any and all State laws insofar as they may now or hereafter relate to any

employee benefit plan"). Generally, when a state law claim could serve as an alternative means of recovering benefits allegedly due under ERISA, ERISA will preempt the state law. *See Gresham v. Lumbermen's Mut. Cas. Co.,* 404 F.3d 253, 258 (4th Cir. 2005). As the Supreme Court has noted, "any state-law cause of action that duplicates, supplements, or supplants the ERISA civil enforcement remedy conflicts with the clear congressional intent to make the ERISA remedy exclusive and is therefore pre-empted." *Aetna Health, Inc. v. Davila,* 542 U.S. 200, 124 S. Ct. 2488, 2495 (2004). Because a plaintiff cannot recover under state law if the claim relates to an ERISA plan, this Court must analyze whether ERISA preempts any of Plaintiff's state law claims.

## I.      The Applicability of ERISA

Both parties agree that the wages, vacation pay, stock options and bonus pay at issue are not part of an ERISA employment benefit plan and that these claims are not governed by ERISA. Therefore, the only issue related to ERISA that this Court must consider is whether Defendant Safeway's severance payment program implicates ERISA so that Plaintiff's state law claims related to the severance pay are preempted.

### Safeway's Severance Plan

An employer-established plan that provides severance pay benefits may be a plan covered by ERISA. *See Biggers v. Wittek Indus., Inc.*, 4 F.3d 291, 295 (4th Cir. 1993) (holding that employer's severance plan was a welfare benefit plan under ERISA). The statute defines an employee welfare plan as "any plan, fund, or program which . . . is . . . established or maintained by an employer . . . for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise . . . any benefit described in section 186(c) of this title." 29 U.S.C. § 1002(1). In turn, Section 186(c) lists among covered benefits "money or other thing[s] of

value paid by any employer to a trust fund established by such representative for the purpose of pooled vacation, holiday, severance or similar benefits." 29 U.S.C. § 186(c)(6).  Not all severance pay arrangements fall within the ambit of ERISA, and to create an ERISA obligation on the part of the employer, the plan "must otherwise meet the definitional elements of an employee welfare plan." *McPherson v. Maryland Pub. Employees Council*, 943 F. Supp. 579, 583 (D. Md. 1996).  The Supreme Court has made clear that ERISA applies to employee benefit *plans*, not simply to benefits. *Fort Halifax Packing Co., Inc. v. Coyne*, 482 U.S. 1, 11 (1987).

Unfortunately, the ERISA statute does not give a precise definition of what may constitute an employee benefit plan.  *Id.* at 8-9 ("the terms 'employee benefit plan' and 'plan' are defined only tautologically in the statute, each being described as 'an employee welfare benefit plan or employee pension benefit plan or a plan which is both an employee welfare benefit plan and an employee pension benefit plan'"); *Massachusetts v. Morash*, 490 U.S. 107, 113 (1989) ("The precise coverage of ERISA is not clearly set forth in the Act").  To interpret ERISA's provision, the Supreme Court has looked to Congress's purpose in enacting the statute.  *Fort Halifax*, 482 U.S. at 8.  The Supreme Court has observed that:

> Congress intended pre-emption to afford employers the advantages of a uniform set of administrative procedures governed by a single set of regulations.  This concern only arises, however, with respect to benefits whose provision by nature requires an ongoing administrative program to meet the employer's obligation.  It is for this reason that Congress pre-empted state laws relating to *plans,* rather than simply to *benefits.*  Only a plan embodies a set of administrative practices vulnerable to the burden that would be imposed by a patchwork scheme of regulation.

*Id.*  At 11-12 (emphasis in original).  In light of this intent, the Supreme Court ruled in *Fort Halifax* that a Maine statute requiring employers to provide a lump sum severance payment to employees

8

terminated as a result of a plant closing was not a plan within the meaning of ERISA.  Noting that

the state law only requires "a one-time, lump sum payment triggered by a single event," the Court

reasoned that the state law did not call for "an administrative scheme to meet the employer's

obligations."  *Id.* at 12.  Thus, a court's inquiry into whether a specific program is an ERISA "plan"

must focus on whether the program at issue involves an ongoing administrative scheme.  *See, e.g.*,

*Gresham*, 404 F.3d at 258-59 (holding that provision in employment agreement to pay severance

was not preempted by ERISA); *Veldarde v. Pace Membership Warehouse, Inc.*, 105 F.3d 1313, 1316

(9th Cir. 1997) (stating that payment of severance benefits offered in a Stay on Letter did not require

ongoing administrative scheme and did not constitute a plan under ERISA); *Emery v. Bay Capital*

*Corp.*, 354 F. Supp. 2d 589, 595-96 (D. Md. 2005) (holding that email offer of severance payment

did not create an ERISA employee benefit plan); *McPherson*, 943 F. Supp. at 583 (holding that

verbal promise to pay severance was not an ERISA employee benefit plan).

   Other Circuits have elaborated on the *Fort Halifax* decision, in an attempt to set forth the

relevant factors that a court must consider in evaluating the existence of an ongoing administrative

scheme.  In particular, courts have examined the following factors to determine whether a plan

qualifies as an employee benefit plan within the meaning of ERISA:

> (1) whether the payments are one-time lump sum payments or
> continuous payments;
> (2) whether the employer undertook any long-term obligation with
> respect to the payments;
> (3) whether the severance payments come due upon the occurrence
> of a single, unique event or whenever the employer terminates
> employees; and
> (4) whether the severance arrangement under review requires the
> employer to engage in a case-by-case review of employees.

*Donovan v. Branch Banking & Trust Co.*, 220 F. Supp. 2d 560, 565 (S.D. W. Va. 2002); *see also*

*Emmenegger v. Bull Moose Tub Co.,* 197 F.3d 929, 934-35 (8th Cir. 1999); *D'Oliviera v. Rare Hospitality Int'l, Inc.,* 150 F. Supp. 2d 346, 351 (D.R.I. 2001); *Gilmore v. Silgan Plastics Corp.,* 917 F. Supp. 685, 688 (E.D. Mo. 1996) (listing factors often considered in determining whether a severance agreement entails an "ongoing scheme"); *cf. Belanger v. Wyman-Gordon Co.,* 71 F.3d 451, 455 (1st Cir. 1999) ("the existence of a plan turns on the nature and extent of an employer's benefit obligations."). Although this list does not represent an exhaustive list of factors that a court may consider, certain factors may tend to be more indicative of the existence of an ERISA employee benefit plan. *Belanger,* 71 F.3d at 455.

The Safeway severance program applied solely to individuals who were terminated from May 1, 2002 to December 31, 2002. *See* Safeway Severance Plan Effective May 1, 2002 to December 31, 2002 Management and Administrative Staff Reductions in Force (the "Severance Plan"). The Severance Plan was funded and administered by Safeway. According to the Severance Plan Overview, eligible employees would receive one week of pay for every complete year of continuous service, with a minimum of four weeks. Safeway would pay the severance in the form of salary continuation after an employee's official termination date. In addition, the Severance Plan referred to ERISA and contained procedures for an employee to challenge the denial of benefits. The Severance Plan also contained a provision that made the payment of benefits discretionary and read in part:

> Although an employee may otherwise be eligible to receive severance, the Company reserves the right, in its sole discretion, to determine that an employee shall not receive any Severance or shall receive an amount more or less than he or she would otherwise receive.
> . . .
> The Company retains the right to condition the payment of severance under this Plan upon the eligible employee's faithful performance of

> any remaining obligations the employee may owe to the Company,
> including immediate reimbursement to the Company for any cash
> advances and debit balances and the return of all Company property,
> such as keys, manuals, parking passes or other Company property.

Safeway contends that these facts demonstrate that the Severance Plan was an employee benefit plan under ERISA.  With respect to the four factor-test, it appears that some facts weigh in favor of finding an ERISA plan.  That the Severance Plan referenced ERISA and outlined the procedures for challenging the denial of benefits weighs in favor of finding an ERISA plan. Safeway's belief that the Severance Plan constituted an ERISA plan, however, does not transform an otherwise deficient plan into one covered by the ERISA statute.  The Severance Plan did not require a "long-term obligation."  Although Safeway would continue to pay employees one week of pay for every week of service, the length of this obligation was finite.  Also, the Severance Plan more closely resembles a plan that is triggered by the occurrence of a single, unique event than a plan that covers all terminated employees.  Safeway put this plan in place to provide benefits for those who lost their jobs as a result of the company's reorganization.  These benefits did not generally apply to employees terminated at any other time.

The fact that Safeway made the severance payments over a period of time rather than in a lump sum alone cannot serve as evidence of an ongoing administrative scheme.  Courts have held that simply continuing to pay salary for a calculated period of time does not require an administrative scheme.  *Emery*, 354 F. Supp. 2d at 594; *see also Delaye v. Agripac, Inc.,* 39 F.3d 235, 237 (9th Cir. 1994) ("While payment could continue for as long as two years, there is nothing discretionary about the timing, amount, or form of the payment."); *James v. Fleet/Norstar Fin. Group,* 992 F.2d 463, 466 (2d Cir. 1993) (employee's option to receive severance in bi-weekly installments instead of in a lump sum did not prove the existence of ERISA plan); *Wells v. General*

11

*Motors Corp.,* 881 F.2d 166, 176 (5th Cir. 1989) (option for employees to elect two-year installment payments did not render program ongoing); *Herring v. Oak Park Bank,* 963 F. Supp. 1558, 1559 (D. Kan. 1997) (plan requiring payment of a certain sum over a number of months was not an ERISA plan).

Furthermore, the calculation of the amount paid to terminated employees did not require a case by case determination.  Safeway's Severance Benefits Overview, a handout distributed to employees laid off between May 1, 2002 to December 31, 2002 explicitly states, "Based upon the Severance Pay Plan[,] . . . you *will* receive one week of pay for every completed year of continuous service . . . . You *will* continue to receive a weekly paycheck during the period of severance pay, which will be mailed to your home address."(emphasis added).

Likewise, deciding whether employees "faithfully" performed all remaining duties did not require Safeway to make case by case determinations as to eligibility.  The Severance Plan provides examples of what might constitute a "remaining obligation to the company."  Such obligations could include reimbursing the company for any cash advances and debit balances or returning Safeway property, such as keys, manuals, or parking passes.  Assessing whether an employee complied with this provision appears to be a purely ministerial task.  Although these types of determinations require a minimal amount of discretion, a minimal amount of discretion does not necessarily imply an ongoing administrative scheme.  For example, the First, Ninth, and D.C. Circuits have all held a plan does not require an ongoing administrative scheme, as contemplated by ERISA, even if the employer must exercise a small amount of discretion.  *Rodowicz v. Mass. Mutual Life*, 192 F.3d 162, 172 (1st Cir. 1999); *Velarde,* 105 F.3d at 1316-17 (holding that a Stay on Letter providing that employees must perform their duties in a "satisfactory manner" to receive benefits did not constitute an ERISA

plan); *Delaye*, 39 F.3d at 237 (9th Cir.) (holding that promise of severance in employment contract did not require an ongoing administrative scheme even though employer had to determine if employee was terminated for cause to calculate severance pay); *Young v. Washington Gas Light Co.*, 206 F.3d 1200, 1204 (D.C. Cir. 2000) (plan requiring minimal discretion is not necessarily a "plan" within the meaning of ERISA); *see also Emery*, 354 F. Supp. 2d at 594-95 (same); *but see Petersen v. E. F. Johnson Co.*, 366 F.3d 676, 679-80 (8th Cir. 2004) (holding that severance package available only to those terminated "without cause" required ongoing administrative scheme, and thus qualified as an ERISA plan); *Antolik v. Saks, Inc.*, 278 F. Supp. 2d 997, 1003 (S.D. Iowa 2003) (same); *Pane v. RCA Corp.*, 667 F. Supp. 168, 171 (D.N.J. 1987), *aff'd*, 868 F.3d 361 (3d Cir. 1989) (same). At best, the Safeway Severance Plan meets two factors of the four factor test. Therefore, the application of the test does little to illuminate whether the Safeway Severance Plan constitutes an ERISA employee benefit plan.

Where the factors do not weigh heavily either in favor of or against finding an ERISA plan, courts have looked to the *Fort Halifax* decision for guidance. The *Fort Halifax* decision emphasized that Congress enacted the ERISA statute to apply to "benefits whose provision by nature requires an ongoing administrative program to meet the employer's *obligation*." *Fort Halifax Packing Co., Inc. v. Coyne*, 482 U.S. at 12 (emphasis added). Here, it appears that Safeway did not have an *obligation* to pay a severance. By its own account, Safeway could in its discretion refuse to pay benefits to any employee for any reason. As one court has noted, "ERISA is not implicated where the administrator of a plan 'was authorized in his discretion to exclude all employees who had been terminated 'for any reason or no reason at all,' because no careful assessment of 'cause' would be required." *D'Oliviera*, 150 F. Supp. 2d at 354-55 (quoting *Rodowicz*, 192 F.3d at 171). Because

the Severance Plan does not provide a reliable commitment to terminated employees, this plan does not have the most basic qualities of an ERISA plan.  Indeed, Safeway makes almost no commitment to provide benefits to terminated employees, militating against this Court finding that an ERISA plan exists.  *See id.*; *Belanger,* 71 F.3d at 455 ("One very important consideration is whether, in light of all the surrounding facts and circumstances, a reasonable employee would perceive an ongoing commitment by the employer to provide employee benefits.  Thus, evidence that an employer committed to provide long-term or periodic benefits to its employees will often be telling.").  The discretion provision of the Severance Plan would not lead a reasonable employee to believe that Safeway had an obligation to provide this benefit.  Moreover, even if an employee had such an expectation, the Severance Plan did not require an ongoing administrative scheme.  The potential benefit for each employee was solely dependent on the employee's length of service.  As a result, this Court finds that the Severance Plan is not governed by ERISA.  Consequently, this Court will grant Defendant's Motion for Summary Judgment with respect to Plaintiff's ERISA claims, Counts II and III.

**II.**      **Plaintiff's State Law Claims**

Having decided that ERISA does not apply to Plaintiff's claims, this Court must now evaluate whether genuine issues of material fact exist with respect to Plaintiff's state law claims.

**A.**      **Count I - The Maryland Wage Payment and Collection Law**

The Maryland Wage Payment and Collection Law (the "Wage Payment Act") provides that:

> Each employer shall pay an employee or the authorized representative of an employee all wages due for work that the employee performed before the termination of employment, on or before the day on which the employee would have been paid the wages if the employment had not been terminated.

14

Md. Code Ann., Lab. and Empl. § 3-505. The statute defines "wage" as "all compensation that is due to an employee for employment," including "a bonus . . . a fringe benefit; or . . . any remuneration promised for service." Md. Code Ann., Lab. and Empl. § 3-501(c).

Although Plaintiff's Amended Complaint alleges that Safeway did not pay him for wages through his final workday, he has conceded that Safeway has paid him his base salary through December 23, 2002. In addition, Defendant has not moved for summary judgment on the claim for vacation pay under the Wage Payment Act. Therefore, this Court need only to consider whether Mazer may recover severance pay, bonus pay or stock options under the Maryland statute.

      1.   <u>Severance Pay</u>

Defendant asserts that even if the Severance Plan does not constitute an employee benefit plan within the meaning of the ERISA statute, Mazer cannot recover severance pay under the Wage Payment Act.

The Wage Payment Act does not explicitly cover severance pay. The Maryland Court of Special Appeals, however, has opined that severance benefits based on nature or length of service may be recoverable under the Wage Payment Act in *Stevenson v. Branch Banking & Trust*, 861 A.2d 735, 743-51 (Md. Ct. Spec. App. 2004). In *Stevenson,* the terminated employee brought suit against her employer under the Wage Payment Act for severance pay and other benefits. In this matter of first impression, the court concluded that severance pay that represents deferred compensation for work performed could be considered a "wage" for the purposes of the statute. Nevertheless, the court found that the *Stevenson* plaintiff's severance pay did not constitute a wage because the plaintiff's termination compensation was payment for her agreement not to compete following her termination. *Id.* at 749. Because the plaintiff could not perform all the work necessary to earn the

severance pay before her termination, the court ruled that the Wage Payment Act did not provide plaintiff with a remedy.

As opposed to the severance benefits at issue in *Stevenson*, a terminated employee could become eligible for the Safeway's Severance Plan benefits as of his or her date of termination. Whereas the plaintiff in *Stevenson* could not refrain competing with her employer until after her termination, the Severance Plan does not have a similar qualification. Defendant's representative, Gwin, has admitted that she told employees that if they worked past the initial layoff date, they would get a severance, provided that they were not terminated for cause. Likewise, the plan description conditions eligibility for severance on an employee's performance before termination, not any actions in the future. Therefore, despite Safeway's arguments to the contrary, it appears that employees could have performed all acts necessary to receive severance pay prior to their termination.

Safeway also contends that it had no obligation to pay Mazer severance because the company reserved the right not to pay severance pay to any employee. Although the Severance Plan document states that the company could refuse to pay severance pay to a terminated employee for any reason, this Court finds evidence that Safeway promised the severance pay to Mazer as remuneration for his continued employment. Gwin specifically told Mazer that he would be eligible for severance pay if he worked through the first layoff date. After the first layoff date passed, Gwin told Mazer that if he worked through the second layoff date he would be entitled to severance benefits. Despite the fact the Safeway claims that it could simply refuse to pay Mazer for any or no reason, the Company did not make this representation to Mazer and other laid off employees. Furthermore, Mazer relied on Gwin's statements in making his decision to continue working at

Safeway past the original layoff date.  These facts all support the conclusion that Safeway promised to pay a severance to Mazer and other employees in exchange for their work.  Safeway derived a benefit from the continued employment of Mazer and others.  Safeway cannot claim it made no promise to pay severance to these individuals simply because that argument now serves its purposes.

Although the Severance Plan benefits may be recoverable under the Wage Payment Act as a general matter, this Court must also analyze whether Defendant has proffered sufficient evidence to show that Plaintiff cannot make a claim for severance in this particular case.  Safeway contends that Mazer did not meet the eligibility criteria for severance pay because it terminated Mazer for cause and that Mazer did not faithfully perform his remaining obligations.  In addition, Safeway asserts that Mazer's actions violated Safeway's policies regarding the treatment of confidential proprietary information.  In particular, Safeway states that Mazer's acts violated the following provisions of Safeway's Code of Conduct:

> Company resources must be used for Company purposes only. Such resources include time, materials, goods and merchandise, vehicles, equipment and proprietary information including (but not limited to) names of customers and suppliers, business plans and unpublished financial and marketing information.  Personal use of such resources, or appropriation of Company property (including files and other information) without proper permission, may amount to theft of Company property.
> . . .
> Each employee is responsible for preserving the confidentiality of a variety of information that, if released, may lose its value or hurt the Company's competitive position. This includes business and financial information, customer account information, new project and marketing plans, cost data, salary information and personnel information.
> . . .
> To protect the information stored within the Company's computer systems and computer hardware and software, you as an employee are required to adhere to the security systems developed for these purposes.

. . .

> As part of his or her employment relationship with, and the attendant duty of loyalty to, the Company, every Safeway employee has the obligation to cooperate with the Company in the conduct of internal inquiries or investigations.  The most important element of this obligation is the employee's duty to make full and truthful disclosure, when questioned by an authorized representative of the Company, regarding all matters relating to the Company's business of which the employee is aware.

In support of this argument, Safeway relies on the fact that Mazer took confidential pricing information on the day before he resigned from Safeway, presumably to share this information with Safeway's competitor, and Mazer's new employer, Giant.  Safeway also alleges that Mazer violated the company's policy on internal inquires by failing to cooperate with Mr. Harris and failing to return  all the company's proprietary information in a timely manner.  Responding to these accusations, Plaintiff asserts that he needed the pricing information to perform his duties at Safeway and that he and others would routinely copy company files to work from home.

There exists a genuine issue of material fact regarding Plaintiff's motives and whether he violated Safeway's policies.  Plaintiff has presented evidence that a reasonable juror could find persuasive.  Safeway has not presented any additional evidence to refute Plaintiff's account, such as circumstantial evidence that Giant became aware of or used Safeway's confidential pricing information.  In addition, Mazer's supervisors have testified that before the December 2002 incident, they never had any reason to doubt Mazer's loyalty to Safeway.  This Court cannot decide the credibility of conflicting testimony on a motion for summary judgment.  *See Summerlin v. Edgar,* 809 F.2d 1034, 1039 (4th Cir. 1987) ("Credibility of  conflicting testimony is not, on a summary judgment motion, an issue to be decided by the trial judge").  For these reasons, this Court cannot say that as a matter of law that Safeway had no obligation to pay Mazer severance pay under the

Maryland law and will deny Defendant's Motion for Summary Judgment on Plaintiff's claim for severance pay under the Wage Payment Act.

    2.    <u>Bonus Pay</u>

In contrast to severance pay benefits, bonus pay is expressly covered by the Wage Payment Act. *See* Md. Code Ann., Lab. and Empl. § 3-501(c)(2)(i) (defining "wages" to include bonuses). Expounding on this provision, the Maryland Court of Appeals has stated that a bonus constitutes a wage only if given in exchange for an employee's work. *See Medex v.* McCabe, 811 A.2d 297, 302 (Md. 2002); *Whiting-Turner Contracting Co. v. Fitzpatrick*, 783 A.2d 667, 672 (Md. 2001). The court explained the policy behind this requirement in *Whiting-Turner Contracting Co. v. Fitzpatrick*:

> [R]eading the statute as including a bonus as wages only when it has been promised as part of the compensation for employment is logical and makes good common sense . . . . If a bonus is to be made part of the wage package, it can be negotiated and included in what has been promised. Similarly, whether commissions are to be paid or what fringe benefits attach are matters for agreement in advance of the employment or *to become a part of the undertaking during the employment*. Once a bonus, commission or fringe benefit has been promised as a part of the compensation for service, the employee would be entitled to its enforcement as wages.

*Whiting-Turner*, 783 A.2d at 672 (emphasis added).

Refuting Mazer's argument that he is entitled to the 2002 bonus, Safeway argues that Mazer may not recover under the Wage Payment Act as: (1) Mazer would not have earned the bonus because of his "misconduct"; (2) the bonus was discretionary; and (3) the bonus did not depend on Mazer's work alone.

This Court has addressed the substance of Defendant's first argument and has already determined that Plaintiff has established the existence of a genuine issue of material fact regarding whether his actions violated Safeway's policies. For the reasons set forth in Section II.A.1, this

Court finds Defendant's first argument unpersuasive.

Defendant's second and third arguments are more compelling.  Both arguments relate to the long-standing rule that no enforceable contractual obligation arises when an employer offers an employee a bonus for doing that which an employee is already required to do.  *See Medex*, 811 A.2d at 305 (quoting *Johnson v. Schenley Distillers Corp.*, 28 A.2d 606 (Md. 1942)); *see also Windesheim v. Verizon Network Integration Corp.*, 212 F. Supp. 2d 456, 462-63 (D. Md. 2002) (holding that payment of bonus was gratuitous and thus not recoverable under Maryland law).  However, under the Wage Payment Act, "[c]ontractual language between the parties cannot be used to eliminate the requirement and public policy that employees have a right to be compensated for their efforts." *Medex,* 811 A.2d at 304.  Therefore, this Court must look beyond the language of the contract to decide whether Safeway offered the bonus to Mazer for work already performed or whether the right to the bonus "formed part of the inducement for his initial and continuing employment." *Id.* at 306.

It is undisputed that before Mazer tendered his resignation, Gwin told Mazer that he would receive a bonus if one was paid for 2002.  In addition, parties also acknowledge that Mazer became aware of his eligibility for a year-end bonus during 2002.  Apart from this testimony, Safeway's procedures for administering the year-end bonus remain shrouded in mystery.  Safeway has not offered any guidance as to how it calculates the bonus, but has stated that "the bonus is discretionary . . . and not geared toward work performed by an individual."  Safeway's Rules for Administration of the 2002 Bonus offer little additional information.  Even Mazer has testified that he did not know how the company calculated the bonus in any given year.  Mazer only knew that Safeway awarded the bonuses to certain employees after "a lot of specific discussions."  For all practical purposes, Mazer could not expect a bonus in exchange for work because he did not know whether he would

20

ever receive a bonus.  As a result, no reasonable juror could find that Mazer was "promised" the bonus based on this evidence.

As the Safeway 2002 bonus does not constitute wages within the meaning of the Wage Payment Act, this Court will grant summary judgment on the claim for bonus pay under the statute.

3.    Stock Options

Like severance pay, stock options are not explicitly referenced in the Wage Payment Act. Although the Maryland courts have not addressed this question, recently, the Fourth Circuit has examined this precise issue in *Varghese v. Honeywell Int'l, Inc,*, 2005 WL 2219626 (4th Cir. 2005). The plaintiff in *Varghese* brought suit under the Wage Payment Act, alleging that his employer violated the Maryland law when it terminated his right to exercise previously granted stock options. *Id.*, at *1.  The plaintiff's employer never promised the stock options to the plaintiff, but granted the options to the plaintiff based on the duties of the plaintiff and his present and potential contributions to the company's success.  *Id.*, at *2.  Reasoning that the stock options in *Varghese* did not constitute wages within the meaning of the Wage Payment Act, the Fourth Circuit explained:

> [N]o document or testimony sets forth any conditions that, once satisfied, would convert mere eligibility to entitlement . . . Such discretion counsels against construing the stock option grants at issue as "wages." . . . [W]e would note that the mere fact that the stock options were granted does not convert them from a form of a gratuity or reward to "wages" that must be paid.  Under that logic, any and all forms of compensation, once granted, would constitute "wages." Maryland law applies a much narrower brush, defining wages as compensation *promised* to an employee as remuneration for that employee's labor . . . "Wages" are not defined *ex post facto,* viewing the actual grant as the penultimate indication of whether a form of compensation constitutes a "wage."   The grant of a form of compensation not contained in the employment agreement is not a "wage" because it was not promised.  The [Maryland Wage Payment Act] protects the proper expectation of promised remuneration. Where there is no promise, there can be no proper expectation.

21

*Id.*, at *6-7.

Here, Mazer has not provided evidence that he expected the stock options in exchange for his work performed.  While Mazer has averred that Safeway promised to pay severance benefits and the 2002 bonus, if he continued to work beyond a certain date, he has not directed this Court to any evidence that Safeway assured him that he would receive the stock options in exchange for his continued employment.  Nor does Mazer contend that he expected the stock options before Safeway made the grant.  Mazer only argues that Safeway made an irrevocable grant of these options.  The grant of the options itself, however, does not show that the options were promised.  These facts strongly resemble those in *Varghese.*  Like the plaintiff in *Varghese,* Mazer received the stock options, but did not expect the options as part of his total compensation.  As a result, this Court will grant Defendant's Motion for Summary Judgment on Count I with respect to the stock options.

B.     **Count IV - Breach of the Stock Option Agreement**

Not only does Safeway argue that this Court should grant summary judgment on Count I, but Safeway also asserts that this Court should grant summary judgment on Plaintiff's claim for breach of contract of the Stock Option Agreement.

The Stock Option Agreement generally permits terminated employees to exercise options, subject to the following condition: "The Option may not be exercised to any extent by anyone [in the event that t]he [e]mployee . . . engage[s] in willful misconduct which injures the Company or any of its Subsidiaries."

Again, Safeway points to Mazer's activities on December 18th, 19th and 23rd of 2002 as proof that Mazer engaged in "willful misconduct."  Again, Safeway asks this Court to assume the role of a fact-finder and make determinations about the credibility of witnesses.  Whether Mazer's

actions violated Safeway's policies remains a question of fact. Therefore, this Court will deny Defendant's Motion for Summary Judgment on Count IV.

C.    **Count V - Breach of the Employment Contract**

In addition to the claims under the Wage Payment Act, Plaintiff also seeks to recover lost income and other damages on the theory that Defendant breached an employment contract.

In Maryland, an employment contract of an indefinite duration is considered an at-will employment contract. *See Adler v. American Standard Corp.*, 432 A.2d 464, 467 (Md. 1981). Where the employment relationship is at-will, either party may legally terminate the relationship at any time. *Id.* If the parties have an expressed or implied contract that restricts the employer's discretion to terminate an employee by specifying a definite term of employment, the employment relationship may only be terminated for "just cause." *See Shapiro v. Massengill*, 661 A.2d 202, 208 (Md. Ct. Spec. App. 1995), *cert. denied,* 668 A.2d 38 (Md. 1995). To discern whether the parties intended to establish a contract for a fixed term, courts have examined the circumstances surrounding the formation of the employment relationship. *See Lubore v. RPM Assocs., Inc.*, 674 A.2d 547, 554-55 (Md. Ct. Spec. App. 1996), *cert. denied*, 683 A.2d 177 (Md. 1996).

The parties agree that Mazer was an at-will employee at Safeway when he began work for the company. Yet, Mazer claims that the relationship between Safeway and Mazer changed when Herding requested that Mazer work until January 3, 2003. This Court, however, does not believe that the parties intended to make it more difficult to terminate Mazer when they agreed that Mazer would work past the second layoff date. *Cf. Suburban Hosp., Inc. v. Dwiggins*, 596 A.2d 1069, 1074 (Md. 1991) (holding that an employee remained an at will employee after he entered into a reinstatement agreement and that the employee could be terminated for conduct that did not violate

the agreement).

All the evidence indicates that both parties understood that either Mazer or Safeway could terminate the employment at any time. After the second layoff date, it appears clear that Safeway fully expected that employees could leave before the projected layoff date. Safeway merely *requested* that the employees give two weeks notice before their departure. In fact, when Mazer resigned from Safeway on December 19, 2002, he chose to end his employment on January 2, 2003, one day before his new layoff date. Mazer does not argue that Safeway could pursue a claim for breach of contract for his failure to work through January 3, 2003. Nor does Mazer contend that Safeway could have pressed such a claim if he chose to leave on the date he gave notice. For this reason, the oral request to continue employment did not restrict Safeway's ability to terminate Mazer. Accordingly, this Court will grant summary judgment as to Count V since there is insufficient evidence that the parties intended to enter into an agreement that would limit Safeway's discretion to terminate Mazer.

D.     **Count VI - Defamation**

Plaintiff's Complaint also alleges Defendant defamed him by transmitting the December 27th letter to Giant. To recover for defamation under Maryland law, a plaintiff must establish that: (1) the defendant made a defamatory statement regarding the plaintiff to a third person; (2) the statement was false; (3) the defendant was legally at fault in making the statement; and (4) the plaintiff suffered harm. *See Holt v. Camus,* 128 F. Supp. 2d 812, 815 (D. Md. 1999); *Rosenberg v. Helinski,* 616 A.2d 866, 871 (Md. 1992); *Gooch v. Maryland Mech. Sys., Inc.,* 567 A.2d 954, 961 (Md. Ct. Spec. App. 1990). Generally, a statement is classified as defamatory if it tends to "expose a person to public scorn, hatred, contempt or ridicule, thereby discouraging others in the community from

having a good opinion of, or from associating or dealing with, that person." *Batson v. Shiflett,* 602 A.2d 1191, 1210 (Md. 1992).

Defendant argues that Plaintiff cannot prove a requisite element of a claim for defamation, the falsity of the publication. Safeway states that no evidence demonstrates that the December 27, 2002 letter contained false statements. Yet, the truth or falsity of the contents of the letter goes to the very heart of the dispute in this case. Defendant's letter repeatedly accuses Plaintiff of violating the Maryland Uniform Trade Secrets Act and implies that Plaintiff shared Safeway's confidential with Giant.[2]  On the other hand, Plaintiff has averred that he did not misappropriate Safeway's confidential information and that he did not disclose or intend to disclose any Safeway data to his new employer, Giant. Because these facts remain contested, the parties deserve an opportunity to develop this issue further at trial.

In the alternative, Defendant claims that even if the letter contained defamatory statements that these communications are protected by a conditional or qualified privilege. In a defamation action, a conditional privilege defense allows a defendant to avoid liability for an otherwise defamatory statement "where, in good faith, he publishes a statement in furtherance of his own legitimate interests, or those shared in common with the recipient or third parties, or where his declaration would be of interest to the public in general." *Carter v. Aramark Sports and Entm't Servs., Inc.* 835 A.2d 262, 278 (Md. Ct. Spec. App. 2003) (internal citations and quotations omitted).

Generally, Maryland courts have recognized a common law conditional privilege where the

---

[2] The letter states: "Your actions in *misappropriating* confidential information are *unlawful and actionable, and directly violate the Maryland Uniform Trade Secrets Act*. . .[T]o protect Safeway's Confidential Information, despite your *unlawful actions*, you must agree to permit an IT professional of Safeway's choice to access your home computer(s) and personal email account(s). . . ." (Emphasis added).

speaker makes the defamatory statement to protect a business interest.  *See, e.g.*, *General Motors Corp. v. Piskor,* 352 A.2d 810 (Md. 1976) (holding that company's accusations that employee stole company merchandise were protected by conditional privilege); *Sindorf v. Jacron Sales Co., Inc.*, 341 A.2d 856 (Md. 1975) (ruling that statements made by company that former employee took merchandise without authorization were protected by conditional privilege).  In addition, the notion that an employer's communication about the character of an employee is subject to a conditional privilege has ancient roots in Maryland law.  In the 1890 decision of *Fresh v. Cutter*, 20 A. 774, the Court of Appeals of Maryland held that an employer's voluntary communication to a neighbor about an employee was privileged unless the employer made the statements with actual malice.  *Id.* at 775. Recounting the rule in *Fresh*, the Maryland Court of Appeals in *Sindorf v. Jacron Sales Co.*, explained that such voluntary communications, even if untrue, are privileged because "the communicating party has a duty owed, even though such duty is not a legal one, but only a moral or social duty of imperfect obligation."  *Sindorf*, 341 A.2d at 866.

    In the case at bar, Safeway had a legitimate interest in protecting its business information. The December 27, 2002 letter to Mazer and Giant requested that Mazer protect Safeway's proprietary and confidential information.  When Safeway sent the letter, the company believed, though perhaps erroneously, that Mazer had confidential pricing data that he would share with Safeway's competitor.  Following an internal investigation, Safeway found that Mazer had copied large amounts of data and attempted to send this data to a personal email account.  Safeway sent the December 27, 2002 letter as an effort to ensure that Mazer would not use or disclose the confidential information.  In such circumstances, Safeway's letter to Giant falls under the rubric of the conditional privileged communications described *Fresh* and its progeny.

26

That Safeway and Giant, as competitors, do not share common interests generally does not alter this analysis. The Maryland Court of Appeals has found a conditional privilege to exist where an employer made comments about an employee to a competitor. *See, e.g.*, *Sindorf*, 341 A.2d at 861 (finding conditional privilege even though alleged defamatory communication was made to communicating party's competitor). In addition, this Court agrees with Defendant that Giant and Safeway shared a common interest in complying with the Maryland Uniform Trade Secrets Act. Safeway had in interest in protecting its proprietary information, and Giant had reason to ensure that Mazer did not disclose Safeway's confidential pricing information to Giant representatives. Giant could have faced potential liability under Maryland law. Therefore, this Court finds that Safeway's letter to Giant was conditionally privileged.

The inquiry into whether Safeway may be held liable for defamation does not end with this Court's finding that its communication to Giant was conditionally privileged. A defendant's communication may lose the conditional privilege if the defendant abused the privilege. *See, e.g.*, *Batson*, 602 A.2d at 1215 (holding that instruction to jury did not constitute reversible error because the verdict reflected a finding that defendant lost the conditional privilege); *Marchesi v. Franchino*, 387 A.2d 1192, 1131-33 (Md. 1978) (outlining the circumstances in which conditional privilege is defeated). An abuse of a conditional privilege occurs when a defendant makes a defamatory statement with express or actual malice. *See, e.g.*, *Gohari v. Darvish*, 767 A.2d 321, 332 (Md. 2001) (ruling privilege was forfeited if there is a finding of actual malice); *Marchesi v. Franchino*, 387 A.2d at1131-33 (Md. 1978) (defining actual malice as standard needed to defeat conditional privilege); *Jacron*, 350 A.2d at 699 (noting that privilege is not abused absent showing of express malice; *Hanrahan v. Kelly*, 305 A.2d 151, 160 (Md. 1973) (same). While the existence of a

conditional privilege is regarded as a question of law, whether the defendant has abused this privilege is normally a question of fact for the jury. *See Polanco v. Fager*, 886 F.2d 66, 70 (4th Cir. 1989); *Hughley v. McDermott*, 530 A.2d 13, 20 (Md. Ct. Sp. App. 1987); *Jacron*, 350 A.2d at 700. Nonetheless, courts may rule as a matter of law if the record contains no evidence that the defendant acted with express or actual malice. *See, e.g.*, *Szot v. Allstate Ins. Co.,* 161 F. Supp. 2d 596, 608 (D. Md. 2001) (granting summary judgment on defamation claim where there was no evidence of actual malice); *Rabinowitz v. Oates*, 955 F. Supp. 485, 488 (D. Md. 1996) (same). The standard for "actual malice" is higher than for mere negligence. To make a statement with actual malice, a speaker must possess "a high degree of awareness . . . of probable falsity"and act with knowledge of the falsity or reckless disregard for truth. *Marchesi,* 387 A.2d at 1132 (quoting *Garrison v. Louisiana,* 379 U.S. 64, 74 (1964)).

No reasonably jury could find that Safeway acted with reckless disregard for the truth, or otherwise abused the conditional privilege, by sending the December 27, 2002 letter to Giant concerning the possible misappropriation of proprietary information. Safeway initiated an internal investigation prior to sending this letter and had discovered that Mazer had proprietary information at his home. In addition, Plaintiff has acknowledged that he retained some confidential data after his termination. Plaintiff has testified that he had this confidential information, but that he did not intend to disclose the information to Giant. As stated previously, this Court will not make determinations as to the credibility of conflicting testimony, as such a task lies within the sole province of the trier of fact. Yet, even viewing these facts in the light most favorable to Plaintiff, it appears clear that defendant did not act with a reckless disregard for the truth. Safeway had some basis for the allegations contained in the December 27, 2002 letter. The fact that the Safeway could

28

not ultimately substantiate these statements does not prove that Safeway acted with actual malice. Although Safeway may have acted prematurely, the evidence does not show that Safeway had a high degree of awareness of the probable falsity of its communication. The absence of actual malice proves fatal to Plaintiff's defamation claim; and, as a result, this Court will grant summary judgment on the defamation claim.

E.      **Count VII - Invasion of Privacy, False Light**

This Court will also grant summary judgment on Plaintiff's claim for the invasion of privacy tort of false light. In Maryland, a court may grant summary judgment for the defendant on a false light claim if the defendant's statement is protected by a conditional or qualified privilege. *Bagwell v. Peninsula Reg'l Med. Ctr.,* 665 A.2d 297, 319 (Md. 1995); *see also AIDS Counseling & Testing Ctrs. v. Group W Television, Inc.,* 903 F.2d 1000, 1004 n.1 (4th Cir.1990); *Holt,* 128 F. Supp. 2d at 816. Because this Court has found that Safeway's statements were protected by a conditional privilege, Safeway is entitled to summary judgment on the false light claim.

Even assuming that Defendant's statement was not protected by a conditional privilege, Plaintiff has not proven the elements for the tort of false light. The elements of the invasion of privacy tort of false light differ from those for defamation. A plaintiff may prove a claim of false light invasion of privacy by showing: (1) that the defendant gave publicity to a matter that places the plaintiff before the public in a false light; (2) that a reasonable person would find that the false light in which the other person was placed highly offensive to a reasonable person; and (3) that the defendant had knowledge of or acted with reckless disregard as to the falsity of the publicized matter and the false light in which the defendant placed the plaintiff. *Bagwell,* 665 A.2d at 318 (Md. 1995).

To satisfy the first element, a party must demonstrate that the defendant made the disclosure

29

of the private facts to the public at large. *See Furman v. Sheppard,* 744 A.2d 583, 587 (Md. Ct. Spec. App. 2000) (citing *Hollander v. Lubow,* 351 A.2d 421 (Md. 1976)); *see also Holt*, 128 F. Supp. 2d at 817 ("Under the first prong of a false light claim, a plaintiff must show that the offending statements have been communicated to the public at large or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge.").   The Restatement (Second) of Torts explains:

> The form of invasion of the right of privacy covered in this Section depends upon publicity given to the private life of the individual . . . "Publicity" . . . means that the matter is made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge . . . Thus it is not an invasion of the right of privacy . . . to communicate a fact concerning the plaintiff's private life to a single person or even to a small group of persons.

Restatement (Second) of Torts § 652D, cmt. a. (1977).

Plaintiff concedes that Safeway did not send the December 27, 2002 letter to a large group of people.   Instead, Plaintiff asserts that he has shown that the matter was substantially certain to become one of public knowledge because "several management level persons" and Giant's counsel became aware of the contents of the letter.   No evidence, however, suggests that any person, other than those few individuals who attended one meeting, knew about the December 27 letter.   Given that the record shows that only a few individuals became aware of the contents of the letter, this Court finds that Plaintiff has failed to demonstrate that Safeway gave publicity to the information contained in the December 27, 2002 letter.   The manner in which Safeway made the communication did not make it substantially certain that the information would become public.   As such, this Court will grant summary judgment on the false light claim.

## CONCLUSION

For the aforementioned reasons, this Court will grant partial summary judgment on Count I. On Count I, this Court will grant summary judgment with respect to Plaintiff's claims for base salary, the stock options, and the bonus, but deny summary judgment with respect to his claims for vacation pay and severance pay. This Court will also grant summary judgment on Counts II, III, V, VI, and VII, but will deny summary judgment on Count IV, the breach of the Stock Option Agreement. An Order consistent with this Opinion will follow.

Date:   <u>October 27, 2005</u>                        <u>                /s/                </u>
                                                        Alexander Williams, Jr.
                                                        United States District Judge